## Huber's Estate.

*Gift—Executors and administrators—Decedent's estate—Evidence.*

A claim by an executor that a draft which was the whole estate of the testator, his brother, was a gift to himself, is not sustained by evidence in effect that on the day before testator died he told the executor that he would have to buy a cemetery lot and gave directions as to the manner of his burial and the payment of his funeral expenses, and at the same time indorsed the draft and handed it to his brother, and on the same day executed a will by which he directed that his debts and funeral expenses should be paid, that a tombstone costing an amount stated should be erected over his grave, and that the remainder of his property should go to his two brothers.

Argued April 16, 1902. Appeal, No. 67, April T., 1902, by Frank Huber, from decree of O. C. Allegheny Co., dismissing exceptions to adjudication in estate of Frank Huber, deceased. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed.

Exceptions to adjudication.
The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree dismissing exceptions to adjudication.

*A. E. Weger,* for appellant.—The gift may be sustained as a gift inter vivos under Perry v. Perry, 7 Cent. Repr. 164, Taylor's Est., 154 Pa. 183, and Small v. Small, 56 Kan. 1 (42

Pac. Repr. 323), where gifts made in the last illness were sustained as such: Edwards v. Jones, 1 My. & Cr. 226.

A gift may be made upon condition or trust that the donee pay the donor's debts, funeral expenses, have masses said, keep his grave in order, etc.: Hills v. Hills, 8 Mees & Wels. 401; Larrabee v. Hascall, 88 Me. 511 (34 Atl. Repr. 408), Clough v. Clough, 117 Mass. 83; Sheedy v. Roach, 124 Mass. 472, 477; Grover v. Grover, 24 Pick. 261.

An indorsement of a certificate of deposit and delivery thereof is good, though the money is not received until after the death of the donor: Wheeler v. Glasgow, 97 Ala. 700 (11 So. Repr. 758); Rolls v. Pearce, L. R. 5 Ch. D. 730; Taylor's Est., 154 Pa. 183; Wagoner's Est., 174 Pa. 558.

*J. S. Ferguson*, with him *Henry Meyer* and *E. G. Ferguson*, for appellee.

OPINION BY W. D. PORTER, J., July 10, 1902:

The court below surcharged the accountant by the amount of a draft for $1,780, which had been issued by the Buffalo Savings Bank payable to the order of the decedent. It is here alleged that this action was erroneous, and that the court below ought to have found under the evidence that the draft was a gift from the testator to the appellant. A careful consideration of the testimony has convinced us that the decree was warranted by the evidence. The burden was upon the accountant to establish that it was the intention of the testator that the draft should pass as a gift. The accountant testified fully as to the manner in which the draft came into his possession, and we must assume that he placed his case in the most favorable light possible. He testified in substance as follows: Balthasar Huber was a brother of the accountant and came from Buffalo to the house of the latter in Allegheny City, in the company of some stranger, on March 4, 1899, hopelessly ill of consumption. He had with him his entire estate which consisted of $2.50 in money and a draft for $1,780, drawn by the Buffalo Savings Bank on the Central National Bank of New York, and payable to his order. On March 6 he executed his will, directing that all his just debts and funeral expenses be paid and that a tombstone costing about $50.00 be erected on his grave; and

devising and bequeathing all his property to his brothers Frank Huber, the appellant, and Cornelius Huber, of which will said brothers were appointed executors. At the same time that the will was executed he indorsed the draft in question and it passed into the possession of the appellant, who the same day deposited it in a bank in the city of Allegheny for collection, and subsequently to the death of the testator received the amount in money. The testimony of the appellant with regard to the indorsement of the draft is in this language: Q. Didn't he have a New York Buffalo draft? A. Yes, for $1,780, he assigned that to me; I received the money on the draft before his death; I got the money on the 6th of March and he died the 7th. I received the money on the 6th of March, he came to my house on the 4th of March; he was very sick when he came. . . . I got possession of the draft the 6th of March, sometime between nine and ten o'clock in the morning. At the time I got the draft my brother was in bed, he was sick; he sat up once in awhile but he was in bed the most of the time; he had the consumption. Q. Didn't you know the draft was issued by the Buffalo Savings Bank of New York? A. I did not know; he assigned it over to me. Q. You didn't get the money until after his death? A. The money was left at the bank. Q. By the court: You deposited the draft in the bank for collection and the draft was on the bank in Buffalo? A. Yes, sir. I left the draft at the bank for collection on the 6th of March, sometime in the forenoon, between ten and eleven o'clock. Q. When your brother handed you the draft did he tell you that you should have him buried and put up a tombstone at his grave and pay all the funeral expenses? A. Yes, sir. Q. And have masses said in church for him? A. Yes, sir. Q. And keep his grave in order and good condition right along? A. Yes, sir. Q. Didn't he then just hand you the draft and signed it? A. Yes, sir. Q. When the draft was given to you, did you keep it in your possession, or did you give it to your wife? A. I kept it in my possession, it was given to me. When he came he had it and he gave it to my wife and he sent after me, he was very sick, and he said I am very sick and would have to buy a lot in the cemetery, and he handed the draft over. Q. By the court: What time in the day did you get this draft?

A. Between nine and ten o'clock in the morning. Q. Was that before or after the will was made? A. At the same time he made the will.

It may here be observed that this testimony discloses nothing in the nature of a contract, that Frank Huber would, in consideration of the draft, assume a personal financial liability for the performance of the things which his dying brother directed him to do. The will directed that a tombstone be erected over his grave and indicated the amount of money to be expended for the same. Contemporaneously with the execution of the will the dying man called his brother to him and said, " I am very sick and will have to buy a lot in the cemetery," and he handed the draft over to that brother. At the same time he gave directions as to the manner of his burial and the payment of his funeral expenses, and that masses be said for him in the church, and that his grave be kept in order. This is what the appellant says occurred at the time that that draft was delivered to him by his brother. There is in it nothing which would warrant a finding that it was the intention of this decedent that the brother should appropriate the balance of the draft to his own uses; nor is there anything which would conflict with the distribution of the proceeds of the draft in accordance with the terms of the will which was executed at the same time. The things which the testator directed his brother to do at the time he handed him the draft were the same which it would have been the duty of that brother to do as executor of the will. The draft was delivered to Frank Huber for the purpose of facilitating the discharge of his duties as executor.

This view of the transaction is not in conflict with the testimony of the witness Dornberger, who said that the decedent said that " he wanted to assign everything over to his brother." There is no doubt that the draft was actually indorsed and delivered to Frank Huber, but the question is as to the purpose of the assignment. The testimony of the witness Henry Host is to the same effect. The testimony of Charles J. Weitershausen amounts to nothing more than that the decedent said he wanted to sign the draft over to his brother, for while in one place he says " he wanted his brother Frank to have everything," the recollection of the witness was by no means clear as to what had occurred. This witness, evidently desiring to

be fair, candidly said, " I could not tell just what he said." We are of opinion that the evidence was not such as to warrant the sweeping away of this entire estate under the pretense of a gift to the accountant.

The decree is affirmed.